HEARD NOVEMBER TERM, 1874.

ROGERS vs. HUGGINS.

Under a judgment against an administrator recovered in 1869, land which was of the
intestate at the time of his death may be sold by the Sheriff and conveyed to the
purchaser, even though the heirs of the intestate, and not the administrator, are
in possession.

BEFORE TOWNSEND, J., AT MARION, MARCH TERM, 1873.

This was an action by Barfield Rogers against Mary Ann Rogers
to recover the possession of a tract of land.

The plaintiff gave evidence tending to show that at November
Term, 1869, of the Court of Common Pleas for Marion County, Giles
Elvengton recovered a judgment against Robert R. Rogers as ad-
ministrator of Neal C. Huggins, deceased, for $710.22, on a prom-

issory note of the intestate dated November 26th, 1860; that execution was issued on the judgment, under which the Sheriff levied on the tract of land in dispute and sold and conveyed the same to the plaintiff in September, 1870; that the defendant was the widow of the intestate, and that she, with her children, had resided on the land since the death of the intestate and used the same, with the rents and annual value, worth from $60 to $100.

The defendant offered no evidence, but moved the Court for nonsuit, on the ground that, as the heirs were in possession, the judgment and execution did not authorize the Sheriff to make the levy and sale and convey the estate to the plaintiff. The motion was granted and the plaintiff appealed.

*Harllee*, for appellant:

The Act of 1732 (2 Gen. Stat., 271,) declares lands assets subject to the payment of debts, and subject to the same remedies "for selling, seizing or disposing, &c., in like manner as personal estate is seized, extended, sold or disposed of for the satisfaction of debts."

*Martin* vs. *Latta* (4 McC. Rep., 128,) is a case directly in point. It is there held -that "the lands of an intestate may be sold under an execution obtained against the administrator, without making the heirs parties to the proceedings, notwithstanding there may be sufficient personal assets to satisfy the debts."

The Court in that case quote *D' Urphey* vs. *Nelson*, (2 Brev., 23,) and the decision is appended in a note to *Martin* vs. *Latta*, which meets fully the objections urged in the Court below in this case.

In *Jones* vs. *Wightman*, (2 Hill, 579,) the Court say " the cases of *D' Urphey* vs. *Nelson* and *Martin* vs. *Latta* are regarded by the Court as authority not now to be questioned by either the bar or the bench upon the point decided by them." "It may be that *D' Urphey* vs. *Nelson* was decided wrong on a true construction of the statute of 5 George II, C. 7, but it is now thirty-two years since it was decided; proceedings in our Courts have conformed to it; under executions issued in conformity to precedents settled by it, an unknown amount of property has changed owners," &c. "Under these circumstances, the Court would not only act unwisely, but with a rashness utterly reckless of consequences, were they now to undertake to review and reverse those cases."

The same doctrine is announced in *Vernon & Co.* vs. *Valk*, 2 Hill Ch., 260; also in *Bird* vs. *Houze*, 1 Sp. Eq., 250; *Hull* vs. *Hall*, 2 Rich. Eq., 65. It is true, in the three last cases other circumstances intervened which modified the general rule to a certain extent, as in *Jones* vs. *Wightman* partition of the land had been had *before judgment* and the parties in exclusive possession of their shares. In *Bird* vs. *Houze* the widow and child were in the exclusive possession for twelve years before the sale, which gave them a title by the Statute of Limitations; and in *Vernon* vs. *Valk* there was no judgment against the representative of Valk in this State, and the bill was filed to subject the land here to satisfy a judgment in the State of New York. But in the case under consideration the heirs had done no act before judgment which would entitle them to come within the cases of *Jones* vs. *Wightman, Vernon* vs. *Valk* and *Bird* vs. *Houze;* they were simply living on the land, and fall fully under the holding of *D' Urphey* vs. *Nelson* and *Martin* vs. *Latta*, which are recognized as authority in all those cases on the subject, and the maxim of "*stare decisis*" applied expressly to them.

*Gilliland & Howell* vs. *Caldwell*, (1 S. C., 195,) recognizes the decisions in *D' Urphey* vs. *Nelson* and *Martin* vs. *Latta* as the law. That case held that the Statute of Limitations was a good bar in favor of the heir, and was not the case of a judgment against the administrator and a sale before partition or long-continued possession.

*Mobley* vs. *Cureton* (S. C., 140,) recognizes the same doctrine, but there had been a partition and thirteen years had elapsed.

The recognition of these two leading cases, which are precisely the same as the case under consideration, is so full and uniform in all of the authorities of this State, that it is deemed a work of supererogation to multiply authorities from elsewhere.

*McDuffie & Blue*, contra:

1. "The primary fund for the payment of the debts of a deceased. is the personal estate. That must first be pursued in the hands of the personal representative until exhausted, or until it appears that, by proper diligence on the part of the creditor, it cannot be made available for his demand."—*Goodhue* vs. *Barnwell*, Rice Eq., 198; *Mobley* vs. *Cureton*, 2 S. C., 140.

2. The statute of George II does make descended lands in the possession of the heirs liable for the payment of the debts of the ancestor; but the cause of action must be established against them in a

suit to which they are parties, and they are not bound by a judgment against the administrator to which they are neither parties or privies.—*Bird* vs. *Houze*, Sp. Eq., 250; *Vernon & Co.* vs. *Valk*, 2 Hill Ch., 257; *Drayton* vs. *Marshall*, Rice Eq., 387; *Gilliland & Howell* vs. *Caldwell*, 1 S. C., 194; *Mobley* vs. *Cureton*, 2 S. C., 140.

November 13, 1874. The opinion of the Court was delivered by

MOSES, C. J. This was an action for the possession of certain real estate described in the complaint. Plaintiff claimed title through a Sheriff's sale, under an execution on a judgment recovered against the administrator of the husband of the defendant, she having continued in the possession of the premises since his death. His Honor the presiding Judge nonsuited the plaintiff, holding that a title thus derived was not sufficient to divest the right of the defendant, an heir of the intestate, in possession. Exception by the appellant to this ruling brings the question to this Court. In our view, the conclusion of the Court below is in conflict with the law as understood and recognized in this State for over seventy years; and although dissatisfaction from time to time has been expressed by the bench in regard to the decisions to which it owes its sanction, it has been uniformly accompanied by the declaration that they were not now to be questioned. In *D'Urphey* vs. *Nelson*, (1 Brev., 289,) (decided in 1803 by the Constitutional Court, which then consisted of all the law Judges,) the question of the effect of a judgment against the administrator or executor on a debt of the intestate or testator on the land descended to the heirs or devised by a will was fully considered. The conclusion of the Court was the result of its construction of the statute of 5 George II, C. 7, and it is thus set forth in its own language:

"Being made liable in *like manner as personal estates*, the Act cannot be construed to make any distinction between lands and personal chattels, but they must be considered as equally liable for satisfaction of debts, and to be assets for that purpose in the hands of the personal representative of the debtor; and, therefore, in this case, where the judgment was recovered against the administratrix for the debt of their intestate, after the lands of the intestate had descended (as it has been contended) to his heirs at law, and never came into the hands of his administrators, although, upon the principles of the common law, the heir should have notice, and an

opportunity of defending his estate before he can be divested of it, and it might be reasonable (as it has been argued) that a *scire facias* should first go to call upon him to show cause why the lands should not be taken to satisfy the debt before the execution should issue to seize and sell the land, yet as the Act of 5 George II makes no distinction between lands and chattels, and contains nothing to show that it was the intention of the Act to make the lands liable only in cases where there should be a deficiency of personal estate, the lands of the intestate must be regarded as liable to execution as personal property and to be taken and sold as such without discrimination or exception."

It is full and comprehensive, extending to all the lands of which the testator or intestate died seized and possessed, at least while in the hands of the heirs or subject to their control. *Martin* vs. *Latta* (4 McC., 128,) followed, and was decided in 1827. The suit was for partition among the demandants of a tract of land sold under an execution on a judgment against the administrator on a debt due by the intestate and claimed by the defendant, the purchaser "in his own demesne as of fee." Although it was alleged without contradiction that there were personal assets in the hands of the administrator sufficient for the payment of the debt, yet Judge Nott, who tried the case in Circuit, held that the land was liable and nonsuited the demandant. He was sustained by the Appeal Court, the opinion of which was delivered by Judge Colcock, carrying out to the fullest extent the doctrine declared in *D'Urphey* vs. *Nelson*. In the course of the opinion, referring to the construction which this case had given to the statute 5 George 2, he says : "But even if the objections were greater, we could not at this day depart from the construction which the statute had received for twenty or thirty years; for, by doing so, we should jeopardize one-half of the landed estates in the country." After the lapse of over seventy years from the decision in *D'Urphey* vs. *Nelson*, during all which period a uniform practice has prevailed extending the lien of the judgment against the administrator to all the lands of which the intestate died seized, whether in the actual or constructive possession of the heir, the argument on behalf of the respondent here contends for an exception, so limiting the rule as, in our own view, to destroy its whole bearing and effect. The proposition is, "that the judgment against the administrator and a sale under it are not sufficient to divest the title of the heir in possession, but to do so it was neces-

sary to have a judgment against the heir also." Whether the decisions already referred to as the authority by which the case before us must be governed are right or wrong, they are the consequences of the construction of the statute by the Courts which heard them, and in conformity to it a rule of property was established which to this day has uninterruptedly prevailed. In the language of those decisions, "both lands and personal chattels are equally liable for the satisfaction of debts and are assets for that purpose in the hands of the personal representatives of the debtor." Such, too, seems to have been the view which Mr. Justice O'Neall took of the rule prescribed by *D' Urphey* vs. *Nelson*, as may be gathered from his commentary on it in *Jones* vs. *Wightman* (2 Hill, 581,) where he refers to the language of the decision. And yet this very case of *Jones* vs. *Wightman* is quoted as authority to sustain the proposition now submitted on the part of the respondent. But *Jones* vs. *Wightman* announces no such doctrine; it strictly enforces the rule laid down in *D' Urphey* vs. *Nelson*, applying it while the heirs hold the land as descended estate, whether in actual possession or not, but denying its application, when, by partition or other acts of law, the character of the possession is changed and becomes exclusive in the heir. At page 583, he says: "According to the decision in *D' Urphey* vs. *Nelson* and *Latta* vs. *Martin*, if the lands had not been partitioned, are not in the exclusive actual possession of the heirs entitled to them, they would also be liable to execution on a judgment recovered against the executor or administrator." He distinguishes between the *actual* and *exclusive* possession, thus evidently making a difference between the mere *pedis possessio* and an actual possession so exclusively conferred by act of law as to free the land from all liability as *assets in the hands of the administrator*. The whole review of the said cases by the learned Judge conclusively shows that, in his regard, they proceeded on the assumption by the Court that, under the statute, the executor or administrator was considered in possession until partition or some other act would make the heir not only in actual "but exclusive" possession. The statute, in the view of the Courts which heard *D' Urphey* vs. *Nelson* and *Latta* vs. *Martin*, regarded the real estate in the hands of the administrator at least for the satisfaction of the debt of the intestate. The mere possession of the heir was not in conflict with the right of the creditor to subject the land to the satisfaction of his judgment against the administrator. Until partition, where the administrator should always

be a party, or some act of law so vesting the title in the heir as to disconnect it from the incumbrance which the statute imposes, it must remain subject to the restriction which the Courts in *D' Urphey* vs. *Nelson* and *Martin* vs. *Latta* declare the statute has placed upon it. We have refrained from saying anything (because not necessary to the case in hand) as to the effect of a *bona fide* alienation by the heir before recovery of judgment against the administrator.

*Bird* vs. *Houze*, (Sp. Eq., 250,) is interposed as an authority so affecting the doctrine of *D' Urphey* vs. *Nelson* as to render it inapplicable where the heir has been in actual possession. If this is so, then, notwithstanding the oft-repeated announcement of the bench, that the authority of that case was not to be disturbed, the rule which it established would be of little practical avail, for in the very large proportion of the instances in this State (and the case before us presents one) they upon whom the inheritance is cast are in possession at the very moment of the death of the ancestor, for in nine cases out of ten they are members of his own household. But all that was held in *Bird* vs. *Houze*, on the branch of the case we are now considering, was "that the exclusive possession of the complainants and the acts of ownership exercised by them as heirs of the intestate protected their inheritance from levy and sale under an execution against the administrator." There the Court might well apply the term "exclusive" to the possession of the widow and children, for on the death of his intestate the administrator took charge of the land in question, leased it out for two years and received the rents. At the expiration of that time, without complaint on his part, the distributees (the wife and children) took possession, holding it undisturbed for over ten years after the purchase by the defendant at Sheriff's sale. *Bird* vs. *Houze* was a case in equity, and the Court, notwithstanding what it said in regard to the right of the complainants acquired by their "exclusive possession," did not rest its judgment on that ground alone, but fortified it by the right which they acquired through the laches of the defendant in enforcing his debt against the administrator.

It is not an unmeaning or profitless mode of ascertaining the true principle of a decision to look to the practice which has uniformly prevailed in regard to its subject matter. So settled has been the opinion that the decision in *D' Urphey* vs. *Nelson* was to be understood in the sense of the language of the Court which pronounced it, that the final process adopted to enforce a judgment against an

executor or administrator for the debt of the testator or intestate commanded the Sheriff to levy "on the goods, chattels, houses, lands and other hereditaments and real estate which were of A. B., deceased, in the hands of C. D., his executor or administrator, the defendant, to be administered, etc." Chancellor Johnston, though never satisfied with the decision in *D'Urphey* vs. *Nelson*, said in *Fretwell* vs. *Neal*, 11 Rich. Eq., 371: "it would be an alarming doctrine that a purchaser of estate property under a subsisting judgment against the executor, which judgment expressly makes that property liable, has not obtained a good title simply because the creditor did not make the distributees or legatees parties to his suit, but sued the executor (not being allowed by the forms of law to sue any other) for his debt. Every day furnishes us with instances in which the executor or administrator necessarily represents distributees and legatees in such suits; and if, under such proceedings, a *devastavit* is committed, the remedy must be against the executor." In *Drayton* vs. *Marshall*, (Rich. Eq., 388,) Chancellor Harper said: "It is true that it has been determined (unfortunately, I think,) that the lands in the hands of the heir may be seized and sold under a judgment against the executor himself when the heir has had no opportunity of being heard or making defense. These decisions are too well settled and too many rights have vested under them to permit their being questioned."

It should not be forgotten that the question before us is not as to the nature of the property of the intestate which is to be first applied to the payment of his debts. The case is one at law, for the recovery of real estate, to which the plaintiff asserts title through a sale under an execution on a judgment against an administrator on a debt of his intestate, bringing himself clearly within the established rule in *D'Urphey* vs. *Nelson* and *Martin* vs. *Latta*.

While these cases may not have been entirely satisfactory to some of the Judges who have followed those who decided them, they have been adhered to as prescribing rules of property now well understood and accepted by the community. The indisposition of our predecessors to interfere with the principles which they established may be seen in the oft-repeated declarations both of the law and equity Judges to which we have referred. A deference to the wisdom and experience of those whose places we occupy should deter us from an exploration in search of new principles affecting the regulation of the landed property of the country, when the people,

by their acquiescence without complaint, seem to be satisfied with those familiar to them by their long existence. It may be safer (at least in regard to legal principles, to which rules of property owe their origin,) to sustain the foundations on which our fathers built. So we thought in *Morse* vs. *Adams* (2. S. C., 58,) and *Gage* vs. *City Council of Charleston,* (3 S. C., 492,) and we see nothing in the case before us which should induce a departure from the views which there governed us.

The motion is granted and the case remanded for a new trial.

*Wright,* A. J., concurred.

WILLARD, A. J. The action was to recover possession of land to which the plaintiff claimed title through an execution and sale under a judgment recovered against the administrators of C. Huggins, deceased, upon a debt due by C. Huggins in his lifetime. The defendant is the widow of C. Huggins, who, with her children, is in possession of the land claimed and has since the death of her husband resided on the premises and used the rents and annual value.

The answer of the defendant denies the plaintiff's title, and sets up a claim to homestead, not alleging title in herself or her children as the distributees of her husband. It appears that the actual question on the trial of the case was whether the title of the defendant as distributee of C. Huggins was divested by a sale under a judgment recovered against the administrator of C. Huggins to which defendant was not a party, and when the defendant was in possession claiming title as distributee. The Circuit Judge allowed a motion for nonsuit and dismissed the complaint. In order to determine the present question, it is necessary to decide whether lands in the possession of an heir or statute distributee, actually held under a claim of title as such heir or distributee, are liable to process issued on a judgment recovered by a creditor of the ancestor against his personal representative.

The question is of extreme difficulty under the various decisions of the Courts of this State bearing upon the point, and in order to approach it properly it will be necessary to review the various cases on the subject, to determine first what are the points actually and authoritatively adjudicated on the subject, and, second, what rule and doctrines have been recognized under these various decisions.

First, then, as to the exact points ruled, which, upon the principle of *stare decisis,* should remain undisturbed. In pursuing this

view, we must limit the scope of the various decisions to the exact point presented by the cases for determination.

The first case to be considered is *D'Urphey* vs. *Nelson*. This case came twice before the Court—the first time in 1803, on an appeal taken by the defendant from a verdict rendered for the plaintiff, and a new trial was granted. This decision is reported in Brevard, 289, and also in a note to *Martin* vs. *Latta*, (4 McCord, 128.) The second appeal was heard in 1805 and was in behalf of the plaintiff from a verdict rendered for the defendant, when a new trial was ordered, and is reported in 1 Brevard, 476.

In *D'Urphey* vs. *Nelson*, as reported in 1 Brevard, 289, and the note to *Martin* vs. *Latta*, the rule is stated in the broadest terms, that under a judgment against the personal representative on a debt of the ancestor, the lands of such ancestor in the hands of his heir by descent may be levied without resort to a *scire facias*, and that the fact that the heir has not had notice or an opportunity to defend does not affect the operation of the judgment. To what extent were the points considered in this decision called for by the nature of the case, and to what extent is its authority limited by the facts of the case as presented ? The action was brought by the heir. The defendant claimed that he had acquired title by a sale in execution under a udgment recovered against the administrator of the plaintiff's ancestor upon a debt due by such ancestor. It is not alleged that the heir had at any time since the death of his ancestor been in possession. For aught that appears, the administrator or a stranger may have been in possession at the time the action was commenced and when the judgment was recovered. Had the heir been in possession at the time of the levy and sale, it would be reasonable to expect that the action would have been brought by the purchaser at the Sheriff's sale against the heir, whereas the reverse was the case. Assuming the heir to have been in possession, it would be necessary to infer that he voluntarily relinquished that possession to the purchaser and then turned around and sued him to regain the possession thus voluntarily relinquished. Such a presumption has not reasonable ground of probability. We are at liberty, and indeed are bound, to conclude that the case of an heir being in possession at the time of the commencement of the action against the administrator as well as at the time when judgment was recovered and executed, claiming the land by descent, was not before the mind of the Court. Had it appeared in that case that

the heir not only had been so possessed but that he was capable of making a good defense to the suit which the administrator had allowed to go by default, a case would have been presented full in all the elements necessary to give the fullest authority and sanction to the broad statement of the rule made in that case.

The fact that the Court then considers the question whether in such cases a *sci. fa.* should have issued, does not tend to show that the Court had in mind the case of an heir possessed of a full defense. It was not the office of a *sci. fa.* to bring into question any matter existing before or at the time of the judgment as a means of enlarging or narrowing its scope and effect, of which advantage might have been taken by a plea in bar. The office of the *sci. fa.* was to bring into consideration matters arising subsequent to the judgment which ought to affect its binding force or capability of being executed. We have no reason to suppose that the Court understood the objection of the want of a *sci. fa.* as importing anything beyond a question of regularity in the mode of executing the judgment, unless, perhaps, as a means of having the personalty applied before the realty was reached. When the nature of the *sci. fa.* is considered, we have reason to conclude that the Court did not consider itself called upon by the nature of that objection to decide that an heir who has a defense in such cases is without remedy if the administrator neglects or refuses to interpose such defense, even though the heir has no notice of the pendency of such suit until judgment obtained. The rule that the binding force of a decision, a scommitting the future action of the Court, is limited to so much of the opinion of the Court as was essential to determining the case actually presented, is worthy of greater attention than is bestowed upon it in ordinary practice, for upon it depends the possibility of a full and logical development of law. Its foundations are not laid in an arbitrary assumption nor in any expedient adopted on the ground of convenience. It is sanctioned by experience and springs from a vital principle underlying the operations of the human judgment. Outside of the facts and necessities of a case, judicial conclusions are speculative; it is only when confined to the necessities of the case that they are practical. The speculations of the judicial mind have no peculiar sanction and are as apt to be erratic as those of any other class of systematic thinkers. A practical conclusion derives its value from the sense of responsibility that accompanies it, calling into action

the united powers of the mind. If that sense of responsibility at times appears to check the rapid progress of the mind's action, it at all events gives the highest possible assurance that whatever progress may be accomplished will be substantial and sound. It is the nature of the common law to grow by slow and gradual accretions, and the judicial mind that is anxious to make rapid and extensive conquests to add to the stock of fixed legal ideas is in danger of laboring fruitlessly, because out of harmony with the spirit of the common law. If the rule we are considering was inflexibly adhered to when the disposition of the Judges was to confine themselves strictly to the matter in hand, it is of still greater importance at the present day, when there is a strong tendency to deal with legal subjects on speculative and theoretical grounds. *D'Urphey* vs. *Nelson* is not a case to which the application of the rule just considered is obvious. The learned Judges who decided that case understood fully the importance of strict adherence to the matter in hand, and their opinion contains nothing but what is germane to the case before the Court. Under the views taken by them of the case, it was necessary to put a construction on the language of 5 George II, and they did so. The question clearly involved such a construction, and so far their determination must be regarded as settling the law. They concluded that lands descended were leviable under a judgment against the personal representative recovered upon a debt of the ancestor. So far, the case called for a determination of the point, and, so far as the principle of *stare decises*, the case possesses indisputable authority. The rule for ascertaining the weight of authority steps in here not for the purpose of consulting the weight of any conclusion stated by them, but for the purpose of adding together the real sense and intention of their decision.

They certainly did not intend to hold that no intervening right of third persons, or even of the heir himself, should prevent the land being subjected to the judgment against the administrator. It is only necessary to point to the decisions in the various cases that had reviewed the ground assumed in *D'Urphey* vs. *Nelson*, which will be considered hereafter, to see that it has always been held, not only that there were exceptions to the rule laid down in that case, but that they could be admitted without disturbing the rule itself.

Yet the opinion of the Court in that case gives no intimation of the possible existence of any such exceptions. It would be very unusual for a decision standing in the position of giving the first definitive statement of a rule embracing a comprehensive series of subjects to go so far as to define, with exactness on all sides, the boundaries that are to limit its applications. If this was possible, it certainly was not attempted by the Court in *D'Urphey* vs. *Nelson*. If it was inconceivable that the Court should at once attempt to anticipate all the contingencies that might, in the future, affect the application of the rule of construction propounded, it is still more inconceivable that they should attempt to declare that the rule was without limitation or exception. I can find no sanction for the idea that the Court intended more than to state a general rule, like all other rules, subject to exception. And this conclusion is strengthened by the fact that the facts of this case were such as to call for nothing beyond a general rule of construction. The case was a naked case, involving no circumstances that could by possibility bring in question any exception or limitation to the rule of construction, and, therefore, we mean that a general statement was requisite. So far, then, as it regards the authority of *D'Urphey* vs. *Nelson*, the law stood substantially that lands descended were assets of the ancestor of such a nature that process issued to enforce a judgment against the personal representative might subject them, leaving the question unsettled as to what rights acquired, act performed or assertions of right preferred on the part of the heir, or of third persons, should prevent such subjection of the descended lands until a sufficient cause for subjecting them is established against such heir or other claimant.

In looking into the cases following *D'Urphey* vs. *Nelson*, we will find the view of that case just presented fully confirmed. We will find there distinct exceptions recognized and established, not as considered by the Court as impugning the authority or doctrine of that case, but as exceptions properly embraced within the spirit and intention of the rule laid down by it.

In *Martin* vs. *Latta*, (4 McC., 128,) the suit was partition among distributees.

The purchaser under a judgment recovered against the administrator was a defendant, and pleaded that he was legally seized and possessed of the land in dispute, "in his own demesne as of fee." So far, then, as it regarded this defendant in possession, the issue was

equivalent to that of a suit to try titles against a defendant in pos-session. The report says: "The only question submitted to the decision of the Court was whether the lands of the intestate could be sold by the Sheriff under an execution obtained against the administrator, there being sufficient personal assets to pay the debt without making the heirs parties to the proceeding."

The only fact that appears in the statement of this case that introduces any question not fully considered in *D'Urphey* vs. *Nelson* was the fact that there were personal assets sufficient to pay the judgment without resorting to the realty. That raised a question merely of the priority among different classes of funds bound by the judgment. The question of the liability of the lands under the judgment, independent of the question of priority in their application, stood on the same grounds as those passed upon in *D'Urphey* vs. *Nelson*. In both the purchaser was in possession, leading to the inference that the distributees had never been in possession, and thus the question, being nakedly presented, as it was in *D'Urphey* vs. *Nelson*, called for nothing more than adhesion to the distinct authority of that case. And this was all that the Court did beyond denying the existence of any right of prior application and sanctioning the reasons on which the decision in *D'Urphey* vs. *Nelson* rests.

In *Jones* vs. *Wightman*, (1 Hill, 579,) the action was trespass, *quare fr.*

The plaintiff was in possession as a purchaser under a judicial sale for partition. The defendant was sued for entering his close for the purpose of executing against the land final process issued upon a judgment recovered against the executors of the testator whose title plaintiff had acquired through the proceedings for partition. The question was, therefore, whether lands devised and in the possession of one who had purchased them under a sale for partition could be subjected under process issued upon a judgment recovered against the executors on a debt of the testator, when neither the devisees, nor the purchasers under them, were parties to or had notice of the pendency of the action in which such judgment was recovered.

It was held that under such circumstances the lands could not be reached. We will consider hereafter the views of the Court on the proper understanding of the decision in *D'Urphey* vs. *Nelson;* at present, we are only concerned with the actual point ruled. We

may regard this case as limiting the rule that lands descended are general assets, as laid down by *D'Urphey* vs. *Nelson,* so as to exclude a purchaser from a devisor or heir from its operation. *Bird* vs. *Houze* (Speer Eq., 250,) was a bill for partition by distributees who were in possession. The main point of contest was with a defendant who claimed the premises sought to be partitioned in fee under a sale in execution of a judgment recovered against the administrator on a debt of the intestate. Although the case was in equity, the question was as to what legal right, if any, the defendant acquired under the judgment and execution. The complainants did not claim a right to come into equity in virtue of any equity they had to deprive the defendant of any legal right he may have acquired under the judgment and execution, but sought the Court of Equity in order to obtain partition among themselves,— the question of the defendant's claim of title arising incidentally and collaterally, its existence being independent of the partition they were seeking among themselves. We must regard the judgment of the Court as bearing upon the question of what legal rights, if any, the defendant acquired under the judgment and execution.

This was the first case of the class to which *D'Urphey* vs. *Nelson* belongs, in which it distinctly appears that the distributees took and held actual exclusive possession of the descended lands at the time the action was brought and the judgment recovered against the administrators.

It was also the first where it distinctly appeared that the distributees had a defense to the action against the administrator which the administrator neglected to interpose, and which the distributees were prevented from interposing by want of notice of the pendency of the action. The defense referred to was not a favored defense, but was that of the Statute of Limitations. It was, therefore, the first case in which all the elements of the question were present to enable the Court to define with any degree of certainty the terms and limitations of the rule broadly stated in *D'Urphey* vs. *Nelson.*

The Court denied the legal right of the defendant on both grounds: First, the actual and exclusive possession of the distributees; and, second, the fact that they had a valid defense to the action against the administrator.

Looking only to the necessary consequences resulting from the point actually made in this case, we are brought to the conclusion that it is authority for this proposition, that when the heir has

actual exclusive possession of the descended lands at the time of the pendency of the action against the administrator, and a good defense which might have been interposed by the administrator, but was not, the heir not having notice and an opportunity to defend, the descended lands cannot be subjected in his hands to a judgment recovered in such action against the administrator. So far, the effect of *Bird* vs. *Houze* will not be controverted.

It is necessary to look closely into the nature of the proposition thus advanced by *Bird* vs. *Houze* in order to see what the principles are that are asserted and vindicated by it.

According to *Bird* vs. *Houze*, an heir in actual and exclusive possession of descended lands has an absolute right to insist, where a valid defense exists to an action brought against the personal representative on the ancestor's debt, that such defense shall be interposed. And if such defense is not interposed, the judgment recovered against such personal representative is not a lien on the descended lands in his possession.

This proposition is in exact conformity to the point ruled in *Bird* vs. *Houze*, independently of the reasons given by the Court for its decision in that case. It does not warrant the conclusion that an heir upon whom the title is cast by descent, but who has not taken actual and exclusive possession, can exercise such rights of defense. If such was the necessary conclusion from this case, it would stand in irreconcilable hostility to *D'Urphey* vs. *Nelson*, as we shall hereafter see. On the contrary, it is conceded to an heir in actual and exclusive possession, arising from the nature of such possession. Such being the case, the test of the right of an heir to defend the descended title is whether or not he has had actual and exclusive possession. The right to defend, if the administrator does not, as will hereafter appear, is equivalent to a right to an absolute defense, and is of such nature that it cannot be perfectly exercised unless the heir is made a party to the action. We will now proceed to verify the conclusions just stated.

It is only possible to reconcile *Bird* vs. *Houze* with *D'Urphey* vs. *Nelson* by regarding the first named case as deciding that when an heir has exclusive actual possession the judgment recovered against the personal representative, without making the heir a party or in some way connecting him in privity with the judgment, shall not bind the lands descended in his hands. It will appear that if such fact of actual possession is not in itself sufficient to protect the

descended lands in the hands of the heir unaffected by privity with the judgment, the additional fact that the heir has a defense that the administrator has neglected to interpose cannot make it sufficient without completely undermining the authority of *D'Urphey* vs. *Nelson.*

It is important to examine carefully the proposition just stated, which, if true, must be decisive of the present case, inasmuch as the result that flows from harmonizing *D'Urphey* vs. *Nelson* with the cases depending on it, is the true result to be sought for in settling the law on this point, so long in discussion and doubt.

The first proposition to be considered is, that the two cases can be reconciled if we regard *Bird* vs. *Houze* as simply deciding that the actual and exclusive possession of the heir precludes his being ousted without notice and an opportunity to defend. That these two cases, upon such construction, would not actually interfere with each other, so far as it is a question of authority between them, appears from what has been already presented, namely, that the fact of an actual and exclusive possession was before the Court in *Bird* vs. *Houze,* and was not before the Court in *D'Urphey* vs. *Nelson.* It is still, however, important to go a step further and see whether the ground upon which the decision in *D'Urphey* vs. *Nelson* rests would be disturbed by excepting from the rule there laid down the case of an heir having actual and exclusive possession.

*D'Urphey* vs. *Nelson* is based upon a construction of 5 George II alone. The clause of the statute on which that case rests is that which declares that lands in the plantations shall be "subject to like remedies for seizing, extending, selling and disposing thereof for such debts in like manner as personal estate in the said plantations are seized, extended, sold or disposed of for satisfaction of debts." The object of the statute, according to the construction given in that case, was to assimilate the remedies for satisfying judgments out of both realty and personalty. *D'Urphey* vs. *Nelson* holds that the naked fact that lands have descended by operation of law does not prevent them from being treated as general assets for the payment of the debts of the ancestor chargeable as against his personal representative. So far, the analogy between the situation of realty and personalty considered as assets is perfect, satisfying what the Court considered to have been the intention of 5 George II. If it is held that actual and exclusive possession by the heir prevents the descended assets from being seized under a

judgment against the administrator alone, will the analogy between the cases of realty and personalty similarly situated be destroyed? If not, the whole object of the decision in *D'Urphey* vs. *Nelson* will remain intact, notwithstanding such a conclusion. In a case approaching very closely in principle to the one first stated, personalty loses its character of general assets and cannot be seized under an execution upon a judgment recovered against the personal representative. It is the case of a legacy after assent and actual possession by the legatee.

It was distinctly held in *Alexander* vs. *Williams* (1 Hill, 522,) that after assent and actual possession taken by a legatee, a creditor of the testator cannot seize the property which was the subject of such legacy, in the hands of the legatee, under a judgment against the executor. It is said that the remedy in such cases is, in equity, for contribution, in which suit may be pleaded title by possession matured by lapse of time. The reason assigned for this in the charge of the Circuit Judge in the last named case is that, inasmuch as assent places the subject of the legacy beyond the reach of the executor, it placed it equally beyond the reach of the creditor, there being no allegation of fraud as affecting the assent.

If the reason thus assigned is regarded as the ground of the decision in *Alexander* vs. *Williams*, then, applying that reason to a case where it is attempted to follow realty into the hands of an heir in actual possession, and the answer is that, inasmuch as the administrator cannot in his own right take the descended lands as assets, a creditor of the intestate in the right of the administrator can do no more than the administrator in his own right could do. If the administrator finds it necessary to make the land descended available as assets for the payment of the debt of the estate, he is compelled to obtain an order for the sale of the realty, and to that proceeding the heir is a party and can defend his own interest. To allow the creditor of the intestate to seize the land under a judgment against the administrator alone, would be to allow to him a remedy better than that which the administrator possesses as the representative of all creditors according to their priorities over the assets. But, apart from the particular ground stated in *Alexander* vs. *Williams*, if we compare the relative positions of a legatee in possession after assent and a distributee in actual possession, we will find that in every way the reason for not extending the operation of the judgment to the property in the hands of the heir or distributee

is stronger than those for not extending the operation of the execution against the executor to the property in the hands of the legatee. The title of the legatee is derived from the will of a testator—that of the heir from the law itself. The right of the legatee to enter upon the enjoyment of his legacy is dependent, to a certain extent, upon the will of the executor, and possession and enjoyment can only rightfully be had when it is seen that ample provision is made for the payment of all the testator's debts ; the right of the heir to enter is conferred by operation of law, and arrives at once upon the death of the ancestor, and is absolute. A legacy assented to diminishes the fund primarily devoted to the payment of debts, while the estate of the heir is of so much importance that in equity all legacies must fail before it is subjected to the ancestor's debts.

If, then, execution for the satisfaction of a judgment against the executor cannot be levied in the hands of a legatee after assent and actual possession taken, and if, following the ruling in *D' Urphey* vs. *Nelson*, the realty ought to stand in the same position in relation to such a judgment as the personalty does, then, as it follows that the realty should be exempt where the personalty is, lands in the actual possession of the heir ought not to be subject to levy under a judgment against the personal representatives to which the heir is neither party nor privy.

Assuming, then, the real ground of decision in *Bird* vs. *Houze* to be the fact of actual and exclusive possession by the heir, and the relation of that case to *D' Urphey* vs. *Nelson* can be clearly and satisfactorily stated. *D' Urphey* vs. *Nelson* declares that, according to the true intent of 5 George II, real estate must be subjected to a judgment where under similar conditions personal estate would be so subjected. Personal property derived by a legacy after assent and actual possession had is not so liable. Land in the actual and exclusive possession of the heir or distributee is in like condition with personalty held by a legatee after assent, and accordingly *Bird* vs. *Houze* declares that, under the authority of *D' Urphey* vs. *Nelson*, land so circumstanced is not so subject.

It is not possible to bring *D' Urphey* vs. *Nelson* and *Bird* vs. *Houze* into harmony on the idea that the last named case turned upon the fact that the heir had a defense which the administrator had failed to interpose.

Let us state the law as it would have to stand under such a view of *Bird* vs. *Houze* as that last mentioned : The creditor of a de-

ceased person may bring an action against his personal representative; and if he shall recover judgment in such action, he shall be entitled to process against the personal property and also against the lands of such deceased person in the hands of his heir, and that the heir shall not object that he has not been impleaded to answer as to assets descended; but there shall be a good defense to such action against the personal representative. And if the defendant shall fail to set up such defense, the creditor obtaining judgment therein shall not have execution against the lands of the deceased in the hands of his heir, but shall only have execution against the personal assets in the hands of such personal representative. Such disjointed relations would result under the views now being examined. The right of the creditor as it regarded the nature and effect of the process allowed for satisfying his judgment would be dependent on the will and conduct of the personal representative, and upon the way in which he discharged some assumed duty of protecting a third person neither a party nor a privy to the judgment from what might be an incidental consequence of the recovery of a judgment upon such third person. This is practically subordinating the remedy of a creditor to the duty that a personal representative owes to those in whose interest he ought to exercise his representative powers. It will not be necessary to point out the complication, both as it regards the nature of the rights and remedies of the parties, that would result if the idea of *Bird* vs. *Houze*, under immediate consideration, should prevail, as they are obvious. It is enough to say that it is a sacrifice of all the simplicity that should characterize the nature and operations of remedies.

Chancellor Harper held in *Vernon* vs. *Valk* (2 Hill Ch., 257,) that the heir is not bound by a judgment against the personal representative, and is not by operation of law either a party or privy to it. This is evidently said of the personal relation of the heir to such a judgment, and does not necessarily touch the question whether lands to which he has title by descent can be levied when under such judgment. This being the case, it would be difficult to see how the heir could justly complain that an administrator had not pleaded properly in an action to which he is neither a party nor a privy. But it may be said that the effect of the judgment is such that his lands will be taken away for its satisfaction. If the heir has a right to make such a complaint, legatees and distributees in-

terested in the personalty alone have still greater grounds to complain, for their interest relates to the fund that must primarily suffer from any unjust demand established against the personal representative, while the heir, even if he loses his lands, may possibly be able to throw the loss on those interested in the personalty. Such a complaint could not be listened to as a means of shielding the personal assets from a judgment recovered against the administrator, however negligent the administrator may have been in making a defense. How then, consistently with *D'Urphey* vs. *Nelson*, that assimilates the remedies as affecting realty and personalty, can the heirs enjoy a privilege that is denied to those interested in the personalty alone? It may be said that such a discrimination against those interested in the personal estate results from the fact that the law casts the title to the personalty upon the administrator, and his act, in default, necessarily binds it. Conceding that where the title is cast, there the right and duty to defend that title should be lodged, it would follow that in the case of the heir, inasmuch as the law casts the title upon the heir, the right to defend that title should be lodged in his own hands, and should not be subjected to the control of another, who may either be without a motive to exercise it or absolutely hostile to its exercise. It is not just to ascribe to *D'Urphey* vs. *Nelson* any purpose so inconsistent with justice and convenience as would warrant such a purely arbitrary means of limiting its effect as that of holding that the effect of a judgment, as it regards lands in the hands of an heir, should depend upon the degree of zeal and fidelity with which the administrator seeks to protect the lands of the heir. That case, properly understood, may have misconceived the object and intent of 5 George II, but can lead to no inconvenience. While the descended lands remain undistinguished from the other assets of the estate, with no visible and actual claimant and occupant upon whom process can be served, no inconvenience can result from subjecting it in common with other assets to those general remedies that are usually employed for the satisfaction of the debt of the estate. If the heir wishes an opportunity to make a personal defense, he has but to enter and take actual and exclusive possession, and then he must be made a party to a suit seeking to subject such realty.

Thus far the cases have been considered apart from the reasoning adduced by the Judges for the support of their conclusions, and it is clear that their harmony and consistency is not only possible but

certain if we regard them as supporting the doctrine that actual exclusive possession by the heir prevents a judgment recovered against the personal representative alone from being enforced as against the descended lands so held. It remains to gather from the opinions delivered by the various learned Judges who have passed upon the question, in the various aspects in which it has heretofore been presented, the conclusions of their minds as to the principles involved, and the degree of authority to which the respective cases are entitled. In deciding a question that has seriously embarrassed the bench and bar for a long period of time, no means of throwing light upon the subject should be overlooked or neglected. The tax that is imposed upon the attention by a full consideration of all the lights thrown upon the subject is due to the importance of a question that has been able to elicit so much labor, care and anxiety in the past.

The reasons assigned in *D'Urphey* vs. *Nelson* for its conclusions are dependent wholly upon the idea that the intent of 5 George II was to abolish any difference that had previously existed between realty and personalty as it regarded processes issued for the satisfaction of a judgment. The cases contain no warrant whatever for holding that lands would be subject to execution when personalty under like circumstances would not.

In *Martin* vs. *Latta*, the Court do not seek to enlarge the rule laid down in *D'Urphey* vs. *Nelson*. Some explanations are made for the purpose of showing the reasonableness of that rule, but they all point to the conclusion that the most that was to be understood of the intention of *D'Urphey* vs. *Nelson* was to place realty on the same footing with personalty, as it regards the effect of a judgment against an administrator.

In *Vernon* vs. *Valk*, (2 Hill Ch., 257,) Judge Harper says: "Notwithstanding our decisions that lands in the hands of the heir may be sold by an execution upon a judgment against the executors or administrator, (decisions which, however much we may regret them, have yet obtained too long, and too many rights have vested under them to interfere with them,) yet I suppose an action at law might be sustained against the heir alone." We may safely assume that the Court that used this language did not feel inclined to enlarge the scope and effect of decisions in regard to which they could not suppress the expression of a regret that they had ever existed. We may then conclude that when lands in the hands of the heir are

spoken of, what is meant is that the fact that the legal title is cast upon the heir does not operate to prevent their being subjected to the judgment against the personal representatives. The language quoted above was not called for by the case in hand, the real question there being to what extent, if any, the heir or devisee was personally bound by a judgment against the personal representatives. In *Jones* vs. *Wightman,* (1 Hill, 579,) Judge O'Neall states his understanding of *D'Urphey* vs. *Nelson* and *Martin* vs. *Latta* in the following language: "So long as they remain [the lands descended] in the hands of the heir, they are liable to be seized in execution under a judgment recovered against the heir for the debt of the ancestor. According to the decisions in the cases of *D'Urphey* vs. *Nelson* and *Martin* vs. *Latta,* if the lands have not been partitioned and are not in the exclusive and actual possession of the heir entitled to them, they would also be liable to execution on a judgment recovered against the executor or administrator."

As we have already seen, the case of *Jones* vs. *Wightman* turned on the fact that the heir had alienated the lands in question. If, then, the language of Judge O'Neall is not to be regarded as a final exposition of these cases called for by the case before the Court, still it is of great authority and importance as showing that the view of *D'Urphey* vs. *Nelson,* already presented, was fully considered and understood by the bench at that early day. Judge O'Neall refers to *Alexander* vs. *Williams,* already noticed, as sanctioning the view of this case presented by him. Although he does not point out the exact features of *Alexander* vs. *Williams* that support that view, yet he affords, by his reference to that case, a clear intimation that, directly or indirectly, it limits or explains those cases. It has already been seen that *Alexander* vs. *Williams,* when properly understood in its relation to the previous cases, does in fact, though indirectly, sustain the views above quoted from the language of Judge O'Neall in *Jones* vs. *Wightman.* In *Bird* vs. *Houze,* (Speer Eq., 250,) Chancellor Dunkin sustains, in the Circuit decree, the construction contended for by Judge O'Neall in *Jones* vs. *Wightman.* Although, as in this case, the fact appeared that the complainants had been in actual and exclusive possession for upwards of ten years, and it, therefore, did not necessarily call for a decision as to the effect of an actual and exclusive possession of short duration, yet it is not clear that the Court intended to confirm its reasons to a case where possession had ripened into title,

but to include every case of actual and exclusive possession, however short might be its duration. The following language from the opinion of Chancellor Dunkin favors the latter conclusion, and is of especial value as the expression of a Judge of great prudence. He says "the rule in *D'Urphey* vs. *Nelson* is held by the Court in *Jones* vs. *Wightman* to apply only to cases where the heir has done no act as heir asserting his right of possession before suit brought against the administrator and a recovery had. Recognizing the authority of these cases, the Court is of opinion that the exclusive possession of the complainants and the acts of ownership exercised by them as heirs of the intestate protected their inheritance from levy and sale under an execution against his personal representatives." It may admit of question whether the authority of this case ought to be regarded as finally settling the law in accordance with the opinion in *Jones* vs. *Wightman;* but, at all events, it brings to bear on the present question a weight of judicial opinion entitled to the greatest respect, and supporting the views already presented in regard to the authority of *D'Urphey* vs. *Nelson* and the cases following it.

It appears, then, that, whether we have regard to the direct authority of the decided cases or to the current of judicial opinion, we are brought to the same conclusion, namely, that when the heir or distributee has actual and exclusive possession of descended lands, such lands cannot be subjected under a judgment recovered against the personal representative to which the heir is not a party.

For the reasons above stated, I am compelled to differ from the majority of the Court.